UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


RONALD HAZEN and GISELLA HAZEN,      :
as parents and next friends of       :
R.H., a minor,                       :
                    Plaintiffs,      :
                                     :
        v.                           :          CA 09-313 ML
                                     :
SOUTH KINGSTOWN SCHOOL               :
DEPARTMENT,                          :
                    Defendant.       :


## REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge

        Before the Court are cross motions for summary judgment:
Defendants' Motion for Summary Judgment (Docket ("Dkt.") #14)
("Defendant's Motion for Summary Judgment" or "Defendant's
Motion") and Plaintiffs' Motion for Summary Judgment (Dkt. #17)
("Plaintiffs' Motion for Summary Judgment" or "Plaintiffs'
Motion") (collectively the "Motions").  The Motions are directed
to Count 1 of the Complaint (Dkt. #1).  In Count 1, Plaintiffs
Ronald and Gisella Hazen ("Plaintiffs" or "Parents"), on behalf
of R.H., a minor ("R.H." or "Student"), seek judicial review of a
June 18, 2009, decision by an impartial due process hearing
officer which found that Defendant South Kingstown School
Department ("Defendant" or the "Department") had not denied R.H.
a "free appropriate public education ["FAPE"]," 20 U.S.C. §

1412(a)(1)(A),[1] by conducting an Individual Education Program ("IEP") meeting without the Parents being present, by violating the 2007 IEP by utilizing R.H.'s one-on-one aide to assist other students, and by reducing R.H.'s support services in the proposed 2009 IEP ("2009 IEP"), see Complaint ¶¶ 1, 8-19; see also id., Exhibit ("Ex.") A (Impartial Due Process Hearing Officer's Decision ("Decision")).

This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  A hearing was held on July 28, 2010.  For the reasons stated below, I recommend that Defendant's Motion for Summary Judgment be granted and that Plaintiffs' Motion for Summary Judgment be denied.

## I.   Facts

Plaintiffs, Parents of R.H., reside in West Kingston, Rhode Island, within the school district for the South Kingstown public schools.  Complaint ¶ 2.  The Department is charged with the care, control, and custody of the South Kingstown public schools.

---

[1] The Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. §§ 1400-1487, guarantees disabled children between the ages of three and twenty-one access to a "free appropriate public education ["FAPE"]," id. § 1412(a)(1)(A) id.; see also id. § 1400(d)(1)(A).  "[T]he 'free appropriate public education' ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'"  Roland M. v. Concord Sch. Comm., 910 F.2d 983, 987 (1st Cir. 1990)(quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 203, 102 S.Ct. 3034 (1982)).

Id. ¶ 3.  Among the Department's responsibilities is the
provision of special education and related services to all
children with disabilities residing in South Kingstown pursuant
to the Individuals with Disabilities Education Act ("IDEA" or
"Act"), 20 U.S.C. §§ 1400-1487, and the Rhode Island Board of
Regents Regulations for the Education of Disabled Children ("R.I.
Regs.").  Id.

In 2004 R.H. was diagnosed with autistic spectrum disorder
and mild mental retardation.  Plaintiffs' Statement of Undisputed
Facts ("PSUF") ¶ 3 (citing Transcript of April 9, 2009, hearing
("Tr. Vol. I") at 6; Parents' Hearing Ex. 1); Complaint ¶ 5.  He
has been eligible for special education services every year he
has attended South Kingstown public schools, Complaint ¶ 6, and
has had a one-on-one teaching assistant up until the time of the
due process hearing, Defendant's Statement of Undisputed Facts
("DSUF") ¶ 3 (citing Tr. Vol. I at 40).  Ann Coppola was R.H.'s
one-on-one aide for three years prior to bidding out of the
position.  DSUF ¶ 37 (citing Transcript of May 15, 2009, hearing
("Tr. Vol. IV") at 39).

R.H. began attending Matunuck Elementary School ("Matunuck")
in the South Kingstown school district after moving to Rhode
Island from California in approximately 2005.  See DSUF ¶ 4
(citing Transcript of May 1, 2009, hearing ("Tr. Vol. III") at
6).  When R.H. first entered Matunuck, he had "significant

language delays, cognitive delays, and pretty significant aberrant behavior, tantruming, screaming, noncompliance, throwing items, aggressing toward teachers, which would include hitting or kicking, flailing around on the floor." Id. ¶ 5 (quoting Tr. Vol. III at 7). R.H. made substantial improvements while in the program. Id. ¶ 6 (citing Tr. Vol. III at 7). Around December of his second year at Matunuck, Breta Combs, his special education teacher, recommended that he be transitioned to his home school. Id. (citing Tr. Vol. III at 10). She felt that it was in his best interest to return to his home school, where he could make friends and participate in activities in his home community. Id.

R.H. was placed in a regular education classroom at West Kingston Elementary School ("West Kingston") in the 2007-08 and 2008-09 academic years where, pursuant to his last agreed-upon IEP, dated November 27, 2007 (the "11/27/07 IEP"), he received the services of a one-on-one full-time aide.[2] PSUF ¶ 4;

---

[2] Plaintiffs allege that R.H.'s IEP has provided him with the services of a one-on-one aide every year he has attended South Kingstown public schools. Complaint ¶ 7. Defendant admits that R.H. had a one-on-one aide who would "fade out" as written in the 11/27/07 IEP. Answer to Complaint (Dkt. #5) ("Answer") ¶ 7. "Fading out means to systematically or gradually fade a support or an intervention." Defendant's Statement of Undisputed Facts ("DSUF") ¶ 8 (citing Transcript of May 1, 2009, hearing ("Tr. Vol. III") at 11); see also DSUF ¶ 18 ("When you fade out a teacher aide you gradually remove them [sic] from working directly with the student so that the student becomes more independent.")(quoting Transcript of May 15, 2009, hearing ("Tr. Vol. IV") at 54); Plaintiffs' Statement of Undisputed Facts ("PSUF") ¶ 33 ("The fading out of the aid[e] is a systemic, gradual process.")(citing Tr. Vol. III at 11-12). Ms. Coppola testified that she began "fading out" in April or May of 2008. Tr. Vol. IV at 40, 44; see also PSUF ¶ 34.

4

Complaint ¶ 7; see also 11/27/07 IEP at 1; Transcript of April
23, 2009, hearing ("Tr. Vol. II") at 9 (noting that at the
beginning of the 2007-08 school year R.H. "had just transitioned
from Matunuck" and that "[b]ecause of that transition, he was
going to be fully included all day in the classroom ..."). Ms.
Combs wrote the 11/27/07 IEP with the recommendation that R.H.
have a one-on-one aide. DSUF ¶ 7 (citing Tr. Vol. III at 11);
id. ¶ 12 (citing Parents' Hearing Ex. 2 (11/27/07 IEP) at 15).
His prior IEP, dated November 22, 2006 (the "11/22/06 IEP"), had
also included a provision for a one-on-one aide. See Parents'
Hearing Ex. 10 (11/22/06 IEP) at 11. R.H.'s mother signed the
11/27/07 IEP. DSUF ¶ 13 (citing Tr. Vol. I at 53). The 11/27/07
IEP states that "a decreasing prompt hierarchy will be utilized
to fade aide out once transition has been established to [West
Kingston]." 11/27/07 IEP at 15; see also PSUF ¶ 26 (citing
Parents' Hearing Ex. 3 (2009 IEP)[3]). The fading of the aide
began in April or May of 2008. PSUF ¶ 34 (citing Tr. Vol. IV at
45-46). It was done "more informally" where R.H.'s aide was
instructed to "step back a little bit" to test R.H.'s
independence. Id.

    Lisa Alves had been R.H.'s case manager and special

---

[3] Although PSUF ¶ 26 refers to Parents' Hearing Exhibit ("Ex.") 3
(proposed 2009 IEP ("2009 IEP")), see PSUF ¶ 26, the quotation
actually appears in Parents' Hearing Ex. 2, see Parents' Hearing Ex. 2
(11/27/07 IEP) at 15.

education teacher for the two years he had been at West Kingston. DSUF ¶ 10 (citing Tr. Vol. I at 75; Tr. Vol. II at 6); PSUF ¶ 5 (citing Tr. Vol. I at 75).  In October of 2008, after observing R.H. for over a year, Ms. Alves proposed decreasing the time during which R.H. would have support services.  DSUF ¶ 20 (citing Tr. Vol. I at 84).  Ms. Alves called a meeting which occurred on October 27, 2008, to discuss the availability of teacher assistants at West Kingston to support the students in her program.  Id. ¶ 21 (citing Tr. Vol. I at 80).  Ms. Alves testified that she believed she informed Plaintiffs that the possibility of a reduction in time in the teacher assistants would be discussed and that she "probably told them that we were going to be discussing how we were going to support [R.H.] in the classroom."  Tr. Vol. I at 81-82; see also Defendant's Statement of Disputed Facts and Response to Plaintiff's Statement of Undisputed Facts ("DSDF") ¶¶ 6-7; Tr. Vol. I at 13-15.  In addition to Ms. Alves, Nancy Nettick, Principal, Susi Pendlebury, R.H.'s regular education teacher, and Teresa Eagan, Director of Special Education, attended the meeting.  PSUF ¶ 8 (citing Tr. Vol. I at 76).  Ms. Alves drafted the 2009 IEP for R.H. with 1.5 hours of one-on-one support, based on the classroom schedule of one hour of mathematics instruction and a half hour of writing instruction.  Id. ¶ 10 (citing Tr. Vol. I at 84-85); see also id. ¶¶ 9-10.  Ms. Alves made the decision to recommend a reduction in

6

support services based on her observations of R.H. in the classroom.  DSUF ¶ 26 (citing Tr. Vol. I at 84).  She saw that he needed the most support in math and writing.  Id.

On October 28, 2008, an IEP meeting regarding R.H. was held. Id. ¶ 24 (citing Tr. Vol. I at 53).[4]  At the October 28th meeting, based on Ms. Alves' recommendation, the team supported 1.5 hours for R.H.'s one-on-one services.  Id. ¶ 25 (citing Tr. Vol. I at 84).  Ms. Alves spoke to Ms. Pendlebury regarding the decision to reduce the time of R.H.'s support services to 1.5 hours, id. ¶ 27 (citing Tr. Vol. I at 86), and Ms. Pendlebury requested that R.H. also have an aide during reading instruction, PSUF ¶ 15 (citing Tr. Vol. I at 104).  At the IEP meeting, the Department increased the time for R.H.'s support services to 2.5 hours.[5]  Id.; Defendant's SUF ¶ 28 (citing Tr. Vol. I at 54; Transcript of May 20, 2009, hearing ("Tr. Vol. V") at 74).  R.H.'s mother participated in the discussion to increase the time for the one-on-one aide.  DSUF ¶ 29 (citing Tr. Vol. I at 54; Tr. Vol. V at 74).  The Department sent a letter to Plaintiffs explaining the

_____

[4] A second IEP meeting, scheduled for November of 2008, was cancelled by Plaintiffs.  DSUF ¶ 24 (citing Transcript of April 9, 2009, hearing ("Tr. Vol. I") at 53).  A third IEP meeting was held on January 7, 2009.  Id.

[5] It is not clear whether the decision to increase the time of aide support was made at the October 27, 2008, IEP meeting or the January 7, 2009, continuation of that meeting.  The Hearing Officer appears to have viewed the meetings as one.  See Complaint, Exhibit ("Ex.") A (Impartial Hearing Officer's Decision ("Decision") at 16 ("There was an IEP meeting properly called on October 28, 2008[,] and continued to January 7, 2009[,] at which the Parents were present.").

reasons for the reduction in aide time. Id. ¶ 30 (citing Tr.
Vol. V at 77); see also Defendant's Hearing Ex. 5 (Letter from
Eagan to Parents of 2/5/09 ("2/5/09 Letter")).[6] The 2/5/09
Letter also informed Plaintiffs of the Department's intention to
implement the 2009 IEP. See 2/5/09 Letter at 1. However,
Plaintiffs refused to consent to the proposed 2009 IEP.
Complaint ¶ 20.

After the October 28, 2008, IEP meeting, at Plaintiffs'
request, the Department began data collection on R.H. PSUF ¶ 18
(citing Tr. Vol. I at 105).[7] At the beginning of the 2008-09
academic year, the Department "hadn't really talked too much
about [methods to teach R.H. independence], and then as the year
progressed [the District has] done more ... teaching of how to
ask appropriately, how to raise [his] hand, how to look at the
teacher, and some other learner quality skills." Id. ¶ 19
(quoting Tr. Vol. I at 108)(alterations in original). The
Department intended to put strategies in place for R.H. regarding
skills for him to be independent after the support services were

_____

[6] There are two Defendant's exhibits numbered "5." The Court
refers to the second of these as "Defendant's Hearing Ex. 5."

[7] Although the 11/27/07 IEP did not require that data be
collected, DSUF ¶ 17 (citing Transcript of April 23, 2009, hearing
("Tr. Vol. II")) at 10, it appears that some data was collected prior
to the October 28, 2008, IEP meeting, see Decision at 15 ("Ms. Alves
began a data collection process on the Student on October 22, 2008
..."); Transcript of May 20, 2009, hearing ("Tr. Vol. V") at 16 ("they
had taken three or four days worth of data at that time [the October
28, 2008, IEP meeting]").

reduced.  Id. ¶ 20 (citing Tr. Vol. I at 108-09).  The Department
did not address R.H.'s skills for independence at the beginning
of the 2008-09 academic year because "he still had his one-on-one
[aide]."  Id. (quoting Tr. Vol. I at 108)(alteration in
original).  It was not a focus to teach R.H. to raise his hand in
the classroom when he needed assistance from the classroom
teacher prior to the October 28, 2008, IEP meeting.  Id. ¶ 21
(citing Tr. Vol. I at 109).  Ms. Alves testified that as of April
9, 2009, R.H. had not mastered the skill of raising his hand to
request assistance.  Id. ¶ 22 (citing Tr. Vol. I at 113).
According to Ms. Alves, "[R.H.] would still have a teacher
assistant available to him during the academic tasks, and
*hopefully he would learn the skills* and master the skills to
continue to fade that dependency on the teacher assistant.["]  Id.
¶ 23 (quoting Tr. Vol. I at 109-10)(first alteration in
original).  Visual cues were introduced to R.H. in January or
February of 2009, after the October 28, 2008, and January 7,
2009, IEP meetings.  Id. ¶¶ 24, 27 (citing Tr. Vol. I at 110).
R.H. was nine years old and in the second grade at the time of
the due process hearing.  PSUF ¶¶ 1-2.

## II.  Travel

Plaintiffs filed a request for an impartial due process
hearing with the Rhode Island Department of Education, requesting
that a hearing officer find that Defendant had failed to offer

R.H. FAPE in its 2009 IEP, that the October 27, 2008, meeting violated the IDEA and RI Regs., and that the use of R.H.'s one-on-one aide for another student violated R.H.'s IEP and denied him FAPE. Complaint ¶ 21. Hearings in this matter commenced before Hearing Officer Arthur Capaldi (the "Hearing Officer") on April 9, 2009, and concluded on May 20, 2009. Id. ¶ 22; see also Tr. Vol. I-V.

On or about June 18, 2009, the Hearing Officer issued his Decision. Complaint ¶ 23; see also Decision. The Hearing Officer determined that the 2009 IEP developed by the Department offered R.H. FAPE; that the October 27, 2008, meeting violated § 300.322 of the R.I. Regs., but did not warrant relief and did not deny R.H. FAPE; and that the use of R.H.'s one-on-one aide for another student was not a violation of his IEP and did not deny him FAPE. Complaint ¶ 24; see also Decision.

Plaintiffs filed the instant Complaint in this Court on July 17, 2009. See Dkt. Defendant filed its Answer to Complaint ("Answer") on November 17, 2009. See id. On April 22, 2010, Defendant's Motion for Summary Judgment was filed, followed on April 23, 2010, by the filing of Plaintiffs' Motion for Summary Judgment. See id. A hearing on the Motions was held on July 28, 2010, after which the matter was taken under advisement. See id.

III. **Standard of Review**

Although a party in an Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400-1487, appeal may move

for "summary judgment," the fact that a motion is so captioned

does not mean that the court uses its normal summary judgment

standard of review in which it examines whether genuine issues of

material fact exist. See Browell v. Lemahieu, 127 F.Supp.2d

1117, 1120 (D. Haw. 2000). Rather, the Act provides that, when

an action is brought in the District Court, the Court:

> (i)   shall receive the records of the administrative
>        proceedings;
>
> (ii)  shall hear additional evidence at the request of
>        a party; and
>
> (iii) basing its decision on the preponderance of the
>        evidence, shall grant such relief as the court
>        determines is appropriate.

20 U.S.C. § 1415(i)(2)(C)(i)-(iii); see also T.B. v. Warwick Sch.

Dep't, No. Civ.A. 01-122T, 2003 WL 22069432, at *6 (D.R.I. June

6, 2003). "[T]he provision that a reviewing court base its

decision on the 'preponderance of the evidence' is by no means an

invitation to the courts to substitute their own notions of sound

educational policy for those of the school authorities which they

review." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.,

Westchester County v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034

(1982). Due weight must be given to the state administrative

proceedings. See id.; Abrahamson v. Hershman, 701 F.2d 223, 230

(1st Cir. 1983).

> Although the exact quantum of weight is subject to the
> district judge's exercise of informed discretion, see

11

> Hampton [Sch. Dist. v. Dobrowolski], 976 F.2d [48,] at 52
> [(1st Cir. 1992)]; <u>G.D. v. Westmoreland Sch. Dist.</u>, 930
> F.2d 942, 946 (1st Cir. 1991), the judge is not at
> liberty either to turn a blind eye to administrative
> findings or to discard them without sound reason.  <u>See</u>
> <u>Burlington [v. Dep't of Educ.]</u>, 736 F.2d [773,] at 792
> [(1st Cir. 1984), <u>aff'd</u>, 471 U.S. 359, 105 S.Ct. 1996
> (1985)]("The court, in recognition of the expertise of
> the administrative agency, must consider the findings
> carefully and endeavor to respond to the hearing
> officer's resolution of each material issue.").  In the
> end, the judicial function at the trial-court level is
> "one of involved oversight," <u>Roland M. [v. Concord Sch.</u>
> <u>Comm.]</u>, 910 F.2d [983,] at 989 [(1st Cir. 1990)]; and in
> the course of that oversight, the persuasiveness of a
> particular administrative finding, or the lack thereof,
> is likely to tell the tale.

<u>Lenn v. Portland Sch. Comm.</u>, 998 F.2d 1083, 1087 (1st Cir. 1993).

In short, "the law contemplates an intermediate standard of review on the trial-court level--a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review."  <u>Id.</u> at 1086.  "[T]he procedural protections provided by the administrative process would be rendered meaningless if courts could simply substitute their own preferences for the administrative officers' evaluations."  <u>Kevin G. v. Cranston Sch. Comm.</u>, 965 F.Supp. 261, 263 (D.R.I. 1997); <u>see also</u> <u>Rowley</u>, 458 U.S. at 207 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States.").

## IV.  Burden of Proof

"[T]he party challenging the hearing officer's decision
properly bears the burden of proof in showing that the officer's
decision was erroneous." Barnett v. Fairfax County Sch. Bd., 927
F.2d 146, 152 (4th Cir. 1991); see also Schaffer v. Weast, 546
U.S. 49, 56, 126 S.Ct. 528 (2005)("[T]he person who seeks court
action should justify the request, which means that the
plaintiffs bear the burdens on the elements in their claims.");
id. at 57-58 (concluding in IDEA case that "[a]bsent some reason
to believe that Congress intended otherwise ... the burden of
persuasion lies where it usually falls, upon the party seeking
relief."); id. at 56 (explaining meaning of "burden of proof" in
IDEA case as "which party loses if the evidence is closely
balanced").  Thus, Plaintiffs, as the complaining parties, bear
the burden of proving that the Hearing Officer's decision was
wrong.  See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991
(1st Cir. 1990)(applying IDEA's predecessor, the Education of the
Handicapped Act).

## V.  Discussion

### A.  Hearing Officer's Decision

The Hearing Officer found that the meeting of October 27,
2008, was a meeting of school officials and teachers who would
qualify as an IEP team at which final determinations are made
and, therefore, required that the regulations as to notice to

Parents be followed to ensure Parents' participation.  Decision at 16.  He further found that the decision to eliminate R.H.'s one-on-one aide was in part due to staffing considerations and in part due to Ms. Alves' observation of R.H.  Id.  However, the Hearing Officer noted that whether there was a remedy for the procedural violation depended on whether R.H. was harmed by the violation and whether Parents were prevented from participating in the IEP process.  Id.  The Hearing Officer "d[id] not find any evidence that the procedural inadequacy impeded the Student's right to FAPE, significantly impeded the [P]arent's [sic] opportunity to participate in the decision making process regarding the provision of FAPE (the [P]arents fully participated in the IEP meeting of January 7, 2009)[,] or caused a deprivation of educational benefit."  Decision at 17.  Thus, the Hearing Officer concluded that the procedural violation did not warrant relief.  Id.

Next, the Hearing Officer found no violation of the 11/27/07 IEP because R.H.'s one-on-one aide assisted and/or serviced other students, based on Ms. Coppola's testimony that she had been asked to start fading.  Id. at 19.  The Hearing Officer found this to be a reasonable strategy to help R.H. become less prompt dependent.  Id.  According to the Hearing Officer, "Parents have failed to establish any facts that the ... use of the one-on-one aide in any way prevented or hindered the Student from receiving

14

an educational <u>benefit</u>." <u>Id.</u> He noted that the "'benefit' is determined by the progress being made by the Student," <u>id.</u> at 20, and that R.H. was making progress in the 2007-08 school year, <u>id.</u> Therefore, the Hearing Officer concluded that "the Student has received an educational benefit and therefore FAPE." <u>Id.</u>

Finally, the Hearing Officer rejected Parents' arguments that R.H. had not been properly assessed by the Department as to the amount of support he needed and that the one-on-one aide had not been properly faded out. <u>Id.</u> The Hearing Officer noted that both the 11/22/06 IEP and the 11/27/07 IEP called for fading out; that the Department had been utilizing fade out with R.H. since April or May of 2008; and that how fading out was accomplished was based on observation by the teachers and the progress made by R.H. <u>Id.</u> at 21. Accordingly, the Hearing Officer concluded that the proposed IEP was reasonably calculated to provide an appropriate education and designed to confer an educational benefit upon R.H. <u>Id.</u> at 23.

**B. Plaintiffs' Arguments**

    **1. Did the Department conduct an IEP meeting on October 27, 2008, without notifying Parents or inviting them to participate in violation of § 300.322 of the R.I. Regs., thereby denying R.H. FAPE?**

As noted previously, the Hearing Officer determined that the

October 27, 2008, meeting violated the R.I. Regs.[8]  The Hearing

Officer further found that the decision to eliminate the one-on-

one aide was made at that meeting and "was in part due to staff

consideration and in part due to Ms. Alves' observations of the

Student."  Decision at 16.  However, the Hearing Officer also

concluded that "the procedural violation did not have any impact

on the Parent's full and effective participation at the January

7, 2009[,] IEP meeting," id. at 17, and that there was no

evidence "that the procedural inadequacy impeded the Student's

right to FAPE ... or caused a deprivation of educational

benefit[,]" id. (citing R.I. Regs. § 513[9]).

_____

[8] Section 300.322 of the R.I. Regs. provides in relevant part
that:

> Each public agency must take steps to ensure that one or both
> of the parents of a child with a disability are present at
> each IEP Team meeting or are afforded the opportunity to
> participate, including—
> (1) Notifying parents of the meeting ten (10) school days
> prior to the meeting to ensure that they will have an
> opportunity to participate (the parent may agree to waive the
> ten (10) day notice requirement in order to expedite the IEP
> team meeting); and
> (2) Scheduling the meeting at a mutually agreed upon time and
> place.

R.I. Regs. § 300.322(a).

[9] Section 513 provides in relevant part that:

> In matters alleging a procedural violation, a hearing officer
> may find that a child did not receive a FAPE only if the
> procedural inadequacies—
> (i) Impeded the child's right to a FAPE;
> (ii) Significantly impeded the parent's opportunity to
> participate in the decision-making process regarding the
> provision of a FAPE to the parent's child; or
> (iii) Caused a deprivation of educational benefit.

Plaintiffs agree with the Hearing Officer's finding that there was a procedural violation,[10] see Memorandum of Law in Support of Plaintiffs' Objection to Defendant's Motion for Summary Judgment ("Plaintiffs' Opp. Mem.") at 2; Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("Plaintiffs' S.J. Mem.") at 8, but disagree with his conclusion that "the fact that the decision to eliminate the one-on-one aide was made on October 27, 2008[,] did not impact the full participation by the Parents at the January 7, 2009[,] meeting," Plaintiffs' Opp. Mem. at 2; see also Plaintiffs' S.J. Mem. at 9. Plaintiffs' main argument is that the decision to eliminate R.H.'s one-on-one aide was predetermined prior to the October 28, 2008, IEP meeting. See Plaintiffs' Opp. Mem. at 1-3; Plaintiffs' S.J. Mem. at 7-10. Plaintiffs rely on Deal v. Hamilton County Board of Education, 392 F.3d 840 (6th Cir. 2004), for their contention that "[t]he October 27, 2008[,] meeting 'significantly

_____

R.I. Regs. § 300.513(a)(2); see also Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990)(similar).

   [10] Defendant argues that there was no procedural violation. See Defendants' Amended Memorandum of Law in Support of its Motion for Summary Judgment of Plaintiff's Complaint ("Defendant's S.J. Mem.") at 11 (citing R.I. Regs. § 300.501(b)(3)); see also id. at 12 ("The meeting that was held prior to the IEP meeting of October 28, 2009[,] was not called to discuss R.H.'s reduction in aide services. It was called to discuss staffing in the building if in fact R.H.'s one-on-one aide was decreased."). The Court need not address this argument because even if the Court disagreed with the Hearing Officer's determination that a procedural violation occurred–which it does not–the Court finds, as did the Hearing Officer, see Decision at 17, that such procedural violation does not warrant relief.

impeded the parents' opportunity to participate in the decision-making process,'" Plaintiffs' Opp. Mem. at 3 (quoting R.I. Regs. § 300.513(a)(2)), and that "the predetermination to eliminate the full-time one-on-one aide rendered their participation at the subsequent January IEP meeting[] not meaningful," id. (citing Deal, 392 F.3d at 858).  The Court disagrees for several reasons.

First, although the Hearing Officer stated that "the decision to eliminate the one-on-one aide was made on October 27, 2008 ...," Decision at 16, he also noted that while the participants at that meeting "may have made a decision to eliminate the one-on-one aide ... there is no evidence at all that would establish that the other school personnel at [the October 28, 2008] IEP meeting had the same belief," id. at 16-17. Plaintiffs have proffered no evidence to the contrary.  In fact, when asked if there was any disagreement regarding the decision to reduce R.H.'s support to 1.5 hours, Ms. Alves testified that:

> A    At the IEP meeting, the classroom teacher did express her concerns for upping that to 2.5 to include the reading block that she instructed.
>
> Q    And is the classroom teacher Mrs. Pendlebury?
>
> A    Yes.
>
> Q    And did you ultimately accept her proposal to increase the time to the 2.5 hours?
>
> A    Yes.
>
> Q    And did you accept the increase to the 2.5 because Mrs. Pendlebury had suggested it?

A    Yes, and as a team we had discussed it, and other
             team members agreed.

        Q    And when had you discussed it?

        A    Just at the IEP meeting that day.

Tr. Vol. I at 104.[11]  Thus, although Ms. Alves may have decided

that R.H.'s support should be reduced to 1.5 hours prior to the

October 28th IEP meeting, the outcome of that meeting (and the

January 7, 2009, IEP meeting which followed) was not

predetermined, as R.H.'s support was ultimately increased to 2.5

hours.

        Second, it cannot be said that Plaintiffs' opportunity to

participate in the October 28th and January 7th IEP meetings and

decision-making process was "significantly impeded" or that their

participation was rendered "not meaningful."  R.H.'s mother

testified that she attended two IEP meetings, on October 28,

2008, and January 7, 2009.  Tr. Vol. I at 53-54, 74.  R.H.'s

father was present at the October 28, 2008, and January 7, 2009,

IEP meetings as well.  Id. at 62; see also Parents' Hearing Ex. 3

at 2.  R.H.'s mother further testified that at the October 28th

IEP meeting she stated that she disagreed with the reduction in

hours for R.H.'s aide to 1.5 hours.  Tr. Vol. I at 19-20.

        Q    And during both of those meetings you were part of
             a discussion to discuss an aide for your son?

_____

        [11] In addition, Ms. Coppola testified that the elimination of
R.H.'s one-on-one aide was "[b]eing considered," Tr. Vol. IV at 38,
not something that was "definitely going to happen[,]" id.

                                  19

```
A     Right.

Q     And as part of the discussion, isn't it true that
      while you were in attendance, the time for support
      was increased from one and a half hours per day to
      two and a half hours per day?

A     Yes.

Q     So you were part of a discussion to increase his
      aide time; is that correct?

A     Not on an hourly basis.  All day, that's what we
      were looking for, not on a[n] hourly basis.

Q     Let me ask the question again.  Initially the
      School Department proposed an hour and a half a
      day; is that correct?

A     Right.

Q     And when you objected, the School Department
      increased the time that they were offering an aide
      to two and a half hours a day; is that correct?

A     Yes.

Q     And you were part of that discussion; is that true?

A     No, I never agreed to two and a half hours.

Q     I'm not asking if you agreed.  I'm asking if you
      were part of the discussion to increase the time
      from one and a half to two and a half?

A     I guess I was.
```

Tr. Vol. I at 54-55.  Her testimony at the May 20, 2009, hearing

was similar.  <u>See</u> Tr. Vol. V at 74-75 (agreeing that based on her

disagreement with the original recommendation, R.H.'s support

services were increased to 2.5 hours).

Moreover, at the October 28, 2008, IEP meeting, Plaintiffs

requested that data be collected, as reflected in Ms. Alves'

testimony at both the April 9 and April 23, 2009, hearings:

> Q    [D]id you take any measures to collect any data after that point?
>
> THE WITNESS:    After the IEP meeting?
>
> MS. THOMSON:    Yes.
>
> A    Yes.
>
> Q    And what prompted you to collect that data?
>
> A    Well, I think the parents had requested it ....

Tr. Vol. I at 105.

> Q    Now, up to this time you ha[d] not taken any data, correct?
>
> A    Up until?
>
> Q    Up until the time you made the decision?
>
> A    Correct.[12]
>
> Q    And I think you said your observations and the fact that he was able to maintain grade level and academically he was doing fine, you didn't think there was a need for data?
>
> A    Yes.
>
> Q    When you realized that the parents wanted data, did you start to collect data?
>
> A    Yes.

Tr. Vol. II at 11-12.  Thus, Plaintiffs' input at the October

28th IEP meeting also resulted in data being collected.

Third, R.H.'s mother stated that Parents "had the Groden

Center, who are the autism experts in the State of Rhode Island,

---

[12] See n.7.

come to the second IEP meeting, where they stated the recommendations that needed to be followed so [R.H.] could be independent, and they did do a two-page recommendation list for the school, which we did give to the school." Tr. Vol. I at 34; see also id. at 56 ("I brought my autism experts to dispute what the school was doing."). Plaintiffs' counsel also attended the meetings. Decision at 16.

Patricia S. LeVasseur, of the Groden Center's Home-Based Therapy Services ("HBTS") program, Tr. Vol. II at 53, testified that she attended the January 7, 2009, IEP meeting, id. at 91.

> Q    And at that time, you offered your opinions on the suggestions proposed at that meeting; is that correct?
>
> A    Yes.
>
> Q    And in terms of the reduction of the aide to [R.H.] from one-on-one to two and a half hours per day, what was your opinion on that?
>
> A    That prior to that happening, there needs to be some data collection so that there could be empirical evidence to support where an aide is needed and where an aide is not needed, and that it be done not abruptly but transitioned in a fading kind of process.
>
> Q    And, in your opinion, would the transition from one-on-one all day to two and a half hours, would that be abrupt for a child with autism?
>
> A    Yes.  It's not the way I would do it.

Id. at 91.

Janette Howard Harris, Psy.D., also testified that she "was at [R.H.]'s IEP." Tr. Vol. V at 9.

Q   Have you been involved in [R.H.]'s IEP process?

A   Only in that I attended the IEP meeting at which
    this discussion originally occurred of reducing the
    aide.
    ....

Q   And why did you become involved in that process?

A   I was there at the request of [Plaintiffs], and
    also, as the treatment consultant for [R.H.], who
    was still at that time in the HBTS program ....

Q   And do you recall what the discussion at that IEP
    meeting was?

A   Yes, there were a lot.  I think I have the notes in
    my bag, but the discussion at the IEP meeting was
    largely that [R.H.] was doing quite well, and that
    they had taken three or four days worth of data at
    that time and had begun to fade the full time aide
    to two and a half hours.  They figured he needed
    about two and a half hours a day largely in
    specific academic areas.

Q   And were you asked by [Plaintiffs] to provide an
    opinion on that reduction?

A   Yes, I was asked to provide an opinion about how an
    appropriate basis for the reduction could be
    established and whether or not I thought that the
    data that had been taken thus far was adequate, or
    the fading process which had occurred was adequate,
    and how we would have done it if we were trying to
    fade a one-to-one aide, how the Groden Center would
    have recommended that it be done.

Q   And at the time of the IEP meeting, do you recall
    if you, in fact, had an opinion about whether the
    data was adequate?

A   I did not think enough data had been taken at that
    point or that the data was adequate.

Q   Okay, and do you recall at the time of the IEP
    meeting you also had an opinion about whether the
    aide was faded appropriately up until that point?

A       There did not seem to be, and none was described
        beyond the taking of the data and sort of deciding
        that he needed the most prompts in several areas,
        and so that was where the aide was going to be.
        There did not seem to have been a systematic fading
        process, and it certainly didn't seem to have
        followed any kind of systematic written or
        preplanned.

Tr. Vol. V at 15-17.

Clearly Plaintiffs' views were well-represented at the IEP meetings. The fact that the Hearing Officer ultimately did not accept them does not render their participation "not meaningful." Deal, 392 F.3d at 858; cf. Slater v. Exeter-W. Greenwich Reg'l Sch. Dist., No. CA 06-527 ML, 2007 WL 2067719, at *9 (D.R.I. July 16, 2007)("The bottom line is that the Slaters made their point based on the evidence of record, but it was not convincing to the Hearing Officer.").

Finally, the Deal case upon which Plaintiffs rely is distinguishable. In Deal, an administrative law judge ("ALJ") had found several procedural and substantive violations of the IDEA and ordered the school system to reimburse some of the plaintiffs' costs for private placement for their son. 392 F.3d at 845. The district court found no violations of the IDEA and reversed. Id. The Sixth Circuit affirmed in part and reversed in part the district court's decision. Id. The court stated that "[t]he evidence reveals that the School System, and its representatives, had pre-decided not to offer [the child]

24

intensive ABA[13] services regardless of any evidence concerning [his] individual needs and the effectiveness of his private program." Id. at 857.

> The facts of this case strongly suggest that the School System had an unofficial policy of refusing to provide one-on-one ABA programs and that School System personnel thus did not have open minds and were not willing to consider the provision of such a program. This conclusion is bolstered by evidence that the School System steadfastly refused even to discuss the possibility of providing an ABA program, even in the face of impressive results. Indeed, School System personnel openly admired and were impressed with [the child]'s performance (presumably attained through the ABA program), until the [parents] asked the School System to pay for the ABA program. Several comments made by School System personnel suggested that they would like to provide [the child] with ABA services, i.e., they recognized the efficacy of such a program, but they were prevented from doing so, i.e., by the School System policy. The clear implication is that no matter how strong the evidence presented by the [parents], the School System still would have refused to provide the services. This is predetermination.

Deal, 392 F.3d at 858 (footnote omitted).

Here, it cannot be said that R.H.'s services were predetermined prior to the IEP meetings. Although the elimination of his one-on-one aide remained unchanged, the amount of time of his services was increased at the IEP meetings as a result of input from both R.H.'s Parents and his classroom teacher. Although Parents note the Hearing Officer's finding that the decision to eliminate R.H.'s one-on-one aide was due in

---

[13] Applied behavioral analysis. See Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 845 (6th Cir. 2004).

part to staff considerations, Decision at 16; <u>see also</u>
Plaintiffs' S.J. Mem. at 8, Parents have put forth no evidence
that there was any sort of "unofficial policy" regarding fading
of aides.  Rather, they argue the opposite, that there was no
plan.  <u>See</u> Plaintiffs' S.J. Mem. at 24 (noting that Ms. Coppola
had testified that "there was no plan on how or when to fade").
Moreover, the IEP team heard testimony from Parents and their
experts regarding the services provided to R.H. by the Groden
Center.  Thus, as Dr. Harris noted, "there were a lot [of
discussions]."  Tr. Vol. V at 15.  There is no evidence in the
administrative record that R.H.'s Parents were told that they
could not ask questions during the IEP meeting, as was the case
in <u>Deal</u>.  392 F.3d at 855.  In fact, R.H.'s mother testified that
at the October 28, 2008, IEP meeting she "brought ... up several
times," Tr. Vol. I at 18, the meeting which had occurred the
previous day.  While the <u>Deal</u> court noted that "[s]everal
comments made by School System personnel suggested that they
would like to provide [the child] with ABA services ...," 392
F.3d at 858, in the instant matter, the Hearing Officer
apparently did not accept Plaintiffs' testimony regarding
statements allegedly made by Ms. Alves and others.  His
credibility determination is entitled to deference.  <u>Slater</u>, 2007
WL 2067719, at *9.

        Thus, the Court concludes that the Hearing Officer's

determination that Plaintiffs were not denied meaningful participation in the subsequent IEP meetings due to the October 27, 2008, meeting is supported by the preponderance of the evidence.  See 20 U.S.C. § 1415(i)(2)(C)(iii); see also Deal, 392 F.3d at 860 ("[M]ere 'technical deviations' do not render an IEP invalid."); Roland M. v. Concord Sch. Comm., 910 F.2d at 994 ("procedural flaws do not automatically render an IEP legally defective"); T.B., 2003 WL 22069432, at *9 ("Mere technical violations are not sufficient."); Doyle v. Arlington Cnty. Sch. Bd., 806 F.Supp. 1253, 1260 (E.D. Va. 1992)("[M]ere technical violations of EHA[14] procedures, which do not deny meaningful parental participation, do not render a school system's proposed program inappropriate.  Any other rule would exalt form over substance")(internal citations omitted); Scituate Sch. Comm. v. Robert B., 620 F.Supp. 1224, 1228 (D.R.I. 1985)("The facts of this case are such that the spirit of the regulation was satisfied and the procedural inadequacies are not fatal.").  That evidence includes the fact that the outcome of the October 28, 2008, and January 7, 2009, IEP meetings was not predetermined, as R.H.'s support time was increased from 1.5 to 2.5 hours at those meetings, as well as Parents' participation in the two IEP meetings, in particular in the discussions which resulted in the increase in R.H.'s support time and the collection of data, and

---

[14] The Education of the Handicapped Act, Rowley, 458 U.S. at 179, IDEA's predecessor, Deal, 392 F.3d at 857.

through their experts who were present at the January 7, 2009, IEP meeting.  See Doyle, 806 F.Supp. at 1260 ("The parents here have participated fully in the assessment, eligibility, and IEP process, and have been advised by counsel throughout.  There can therefore be no violation of the EHA."); see also N.L. v. Knox Cnty. Schs., 315 F.3d 688, 695 (6th Cir. 2003)("Accepting the fact that the meetings at issue took place, they do not constitute a substantive harm because the conclusions drawn at the meetings were not a final determination in light of the mother's active participation in the formal IEP Team meeting.").

The Hearing Officer also found that there was no evidence "that the procedural inadequacy impeded the Student's right to FAPE ... or caused a deprivation of educational benefit[.]" Decision at 17.  Plaintiffs argue that R.H. was denied FAPE when the Department predetermined the services of the aide during the October 27, 2008, meeting.  Plaintiffs' Opp. Mem. at 2; see also Plaintiffs' S.J. Mem. at 7.  However, as discussed above, R.H.'s support services were not "predetermined" at the October 27th meeting, as those services were increased from 1.5 hours to 2.5 hours as a result of discussions at the subsequent IEP meetings. Moreover, as will be discussed infra, the Hearing Officer's determination that the proposed IEP provided R.H. FAPE is supported by a preponderance of the evidence.

**2.    Did the Department fail to follow the 11/27/07 IEP
by sharing the services of the one-on-one aide
with other students thereby denying R.H. FAPE?**

The Hearing Officer additionally found no violation of the
11/27/07 IEP because R.H.'s one-on-one aide assisted and/or
serviced other students, Decision at 19, stating that R.H.'s
"Parents have failed to establish any facts that ... the use of
the one-on-one aide in any way prevented or hindered the Student
from receiving an educational benefit," id. (underlining
omitted).  The Hearing Officer reasoned that the 11/27/07 IEP
called for the aide to gradually fade out and that the use of the
aide to assist with another student was part of the fading
process.  Id. at 18-19.

Plaintiffs argue that "the [Department]'s characterization
implies an intentional and planned withdrawal of the aide, which
is in direct conflict with the testimony of the [Department]
staff."  Plaintiffs' Opp. Mem. at 4; see also Plaintiffs' S.J.
Mem. at 22 ("[W]hile assisting another student could be part of
the plan to fade the aide, here [Department] simply used R.H.'s
aide due to lack of staff.").  As a result, according to
Plaintiffs, "[t]he needs of the other IEP student–and not those
of R.H.–were addressed by R.H.'s aide."  Plaintiffs' Opp. Mem. at
4; see also Plaintiffs' S.J. Mem. at 23 ("The support services
that R.H. received were contingent upon the other child's
behavior ....").  The Court again disagrees.

The 11/27/07 IEP called for "[u]se of a decreasing prompt hierarchy ... to fade aide out once transition has been established to W[est] K[ingston]."  11/27/07 IEP at 15; <u>see also</u> DSUF ¶ 12; PSUF ¶ 26.  R.H.'s mother testified that she consented to the 11/27/07 IEP.  Tr. Vol. I at 10.  She subsequently confirmed that she signed the 11/27/07 IEP which included the sentence quoted above.  <u>Id.</u> at 53.  R.H.'s father testified that he, too, consented to the 11/27/07 IEP.  <u>Id.</u> at 71.

Ms. Alves, R.H.'s special education  teacher during the 2007-08 and 2008-08 academic years, Tr. Vol. I at 75, explained the "decreasing prompt hierarchy" as follows:

> What that means is that we would gradually be reducing the amount of time that [R.H.] -- well, the amount of time that the teacher assistant would be working directly with him one on one.  And there's varying levels of prompting that can be utilized, and the most intensive sort of prompting would be like a physical prompt, hand over hand escorting him to certain places, and then a little less intensive would be like an auditory prompt where he's getting a verbal prompt from somebody.  Then there's the visual prompts, a picture cue or a sensory prompt, like some sort of tap on the shoulder, something to remind him to do something, or just even removing the teacher assistant from being right next to him at all times.

Tr. Vol. II at 8-9.  Questioning of Ms. Alves continued:

Q    Is it fair to say that from November of 2007 you made attempts to fade out this aide?

A    Yes.

Q    And how did you determine that it was appropriate to fade out [R.H.]'s aide?

A    Well, in the beginning of the 2007/2008 school

year, he had just transitioned from Matunuck, and
we felt that it was necessary to keep the one-on-
one with him.  Because of that transition, he was
going to be fully included all day in the
classroom, and the teacher assistant had followed
him from Matunuck to West Kingston, so we thought
that sort of consistency would help make the
transition a little easier for him.  As the year
went on, he continued to make progress
academically.  He was developing social skills that
were age appropriate.  He was conversing with
friends.  So towards the second half of the
2007/2008 school year, I noticed just that he was
making a lot of progress socially and academically,
so I instructed the teacher assistant to back off a
little bit and let him try to be a little more
independent.

Q    And it's fair to say that by doing this, you were
following the statement in the IEP, is that
correct?

A    Correct, yes.

Id. at 9-10; see also Tr. Vol. I at 115 ("At the end of last year
the teacher assistant was asked to step back a little bit and see
how he did on his own, work with other students in the classroom,
walk around.").  Ms. Eagan confirmed that among the ways to fade
out an aide were to have the aide work with other students or
leave the classroom for periods of time.  See Tr. Vol. IV at 55.
Dr. Harris also concurred that having the teacher aide move away
from the student, work with other children, and leave the room
for a period of time were steps in the fading process.  Tr. Vol.
V at 56.

Ms. Coppola testified that during the 2007-08 and early
2008-09 school years she serviced one or more other children, as

31

directed by the classroom teacher and Ms. Alves.  Tr. Vol. IV at

7.  Ms. Coppola's testimony continued:

> Q    And why, do you know why you were directed to
>       assist other children?
>
> A    Yes, because I was asked to start fading.
>
> Q    And what was your understanding of what fading was?
>
> A    My understanding of what fading is is to slowly
>       back off and give [R.H.] the opportunity to become
>       more independent.
>
> Q    Were you ever directed how to do so, if you should
>       do so gradually or in what capacity you should
>       start fading away?
>
> A    I did it gradually.
>
> ....
>
> Q    Who instructed you on how you should fade away?
>
> A    Mrs. Alves.

Id. at 7-8.

Plaintiffs do not contest that the aide was to be faded gradually once R.H. had transitioned to West Kingston.  See 11/27/07 IEP at 15.  On the contrary, R.H.'s father testified that: "I do want my son's aide to be taken away slowly in a controlled method so he is independent.  I'm not saying let's keep the aide forever."  Tr. Vol. I at 74.  Plaintiffs, however, contend that "[t]he use [of] R.H.'s aide for the other student as described by [the Department] could not have been part of R.H.'s systemic and gradual fading process," Plaintiffs' Opp. Mem. at 4, because it was "impossible to plan when the other IEP student

32

would have a behavioral outburst[15] ...," id.  Ms. Coppola

described the fading process as follows:

> Q    Did you and Mrs. Alves discuss any type of process
>      of how to fade, whether it be moving away from him,
>      standing beside him, or standing further away
>      versus standing at the door, that type of thing,
>      did you discuss that?
>
> A    I don't really recall.  It wasn't anything that we
>      had written down on paper, if that's what you mean.
>      She might have come into the classroom and if he
>      was sitting in a circle and I was next to him, she
>      might ask me to just back off a little bit. ...
>
> Q    But there was no plan on how to fade or when the
>      times were to fade; is that correct?
>
> A    Right.

Tr. Vol. IV at 8-9; see also Tr. Vol. I at 24-26, 28-30; PSUF ¶¶

19-24, 27.

Thus, although it appears that the fading was done "more

informally," PSUF ¶ 34 (quoting Tr. Vol. I at 114-15), than

Plaintiffs would have liked, see Tr. Vol. I at 29-30, 33-34, 46-

48; id. at 74, it is not the Court's-or the Hearing Officer's, as

he recognized, see Tr. Vol. V at 83-function to second-guess the

Department's method of fading R.H.'s one-on-one aide, see Doyle

---

[15] Ms. Alves confirmed that R.H.'s aide would help out with other students in the classroom when behavior issues arose, Tr. Vol. I at 77-78, and that R.H.'s aide would occasionally leave the classroom in order to do so, id. at 78-79.  Ms. Alves testified that this occurred mostly during the 2008-09 academic year because the other IEP student in R.H.'s classroom that year was mainly in her self-contained classroom during the 2007-08 school year.  Id. at 78.  She further testified that R.H.'s aide was never used to service the other IEP student for academic purposes.  Tr. Vol. I at 78.

v. Arlington Cnty. Sch. Bd., 806 F. Supp. at 1258 ("Courts (and hearing officers) are not entitled to second-guess a school system's decisions as to educational methodology."); see also Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 28 (1st Cir. 2008)("[T]he IDEA confers primary responsibility upon state and local educational agencies to choose among competing pedagogical methodologies and to select the method most suitable to a particular child's needs."); Deal, 392 F.3d at 854 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States.")(quoting Rowley, 458 U.S. at 207).  The hearing testimony supports the Hearing Officer's conclusion that the use of R.H.'s one-on-one aide to assist with other students was part of the fading process and, therefore, not a violation of the 11/27/07 IEP or denial of FAPE. His evaluation of that testimony is entitled to deference.  See Slater, 2007 WL 2067719, at *9 ("The Hearing Officer's interpretation of this evidence and credibility determination is entitled to deference ....").

### 3.  Does the 2009 IEP provide R.H. with FAPE?

The Hearing Officer found that the 2009 IEP was "reasonably calculated to provide an appropriate education and designed to confer an educational benefit upon the Student."  Decision at 23. He therefore concluded that the 2009 IEP "provide[d] the Student with FAPE."  Id. at 4.

Plaintiffs contend that "the proposed IEP is not reasonably calculated to meet R.H.'s unique needs so as to confer a meaningful educational benefit." Plaintiffs' S.J. Mem. at 22; see also id. at 10 ("The [Department]'s elimination of R.H.'s full-time aide without reasonably calculating the amount of support services needed to provide R.H. with a meaningful education[al] benefit denied him a FAPE."); Plaintiffs' Opp. Mem. at 3 (same). Plaintiffs make several points in support of their argument. They assert that the Hearing Officer's conclusion that the proposed 2009 IEP was reasonably calculated to provide R.H. FAPE was erroneous because: the decision to remove R.H.'s full-time one-on-one aide was based in part on staffing needs, Plaintiffs' S.J. Mem. at 12; the decision to eliminate the one-on-one aide was based upon Ms. Alves' limited observations of R.H., id. at 13; the Department failed to teach R.H. the skills he needed to be independent prior to the elimination of his one-on-one aide, id. at 16; and the Department failed to fade the aide pursuant to the prompt hierarchy, id. at 18. However, "[t]he ultimate question for a court under the Act is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time." Roland M., 910 F.2d at 990; see also T.B., 2003 WL 22069432, at *6 (same).

This Court has stated that:

The Supreme Court and First Circuit have consistently construed the FAPE requirement to mean that any given

placement must provide a reasonable probability of educational benefits with sufficient supportive services at public expense. Districts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a basic floor of opportunity. The test under IDEA is not whether the IEP would achieve perfect academic results or whether it is better or worse than a proposed alternative. Rather, the test is whether the IEP is reasonably calculated to provide an appropriate education. [A] FAPE may not be the *only* appropriate choice, or the choice of certain selected experts, or the child's parents' *first* choice, or even the *best* choice.

Slater, 2007 WL 2067719, at *4 (alteration in original)(internal citations and quotation marks omitted); see also C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284 (1st Cir. 2008)(noting that a school system has met its obligation to provide FAPE "as long as the program that it offers to a disabled student is 'reasonably calculated' to deliver 'educational benefits.'") (quoting Rowley, 458 U.S. at 207). "In effect, the IEP is the vehicle for providing a FAPE ...." T.B., 2003 WL 22069432, at *5. "The court's focus is upon the educational program which finally emerges from the administrative review process, not the IEP as originally proposed." Roland M., 910 F.2d at 988. Against this backdrop, the Court turns to the proposed 2009 IEP.

"The IEP must contain, *inter alia*, a statement of the student's present levels of performance; a statement of measurable annual goals, including benchmarks of short-term objectives; and a statement of the special education and related services and supplementary aids and services to be provided to

36

the child." T.B., 2003 WL 22069432, at *5 (citing 20 U.S.C. §
1414(d)(1)(A)(i-iii)). The 2009 IEP meets these requirements.
See 2009 IEP at 3-10, 12-14. R.H.'s level of functional
performance was described as follows:

> [R.H.]'s ability to process visual information is a
> strength for him.
> [R.H.] demonstrates increased ability to focus and attend
> to task following organizing sensory input.
> [R.H.] demonstrates ability to identify his "engine
> level" and to verbalize preferred sensory input (i.e. to
> be "squished").
> [R.H.] is able to follow auditory multi step directions
> well (especially with a visual component).
>
> [R.H.'s] social skills have improved and he is able to
> engage in conversations with peers, as well as join a
> group appropriately.
> [R.H.] has a good receptive understanding of language
> structure.

2009 IEP at 3. In terms of academic achievement, the 2009 IEP
reflects that:

> [R.H.] is currently performing on grade level in all
> academic areas. He has met the benchmarks in all fall
> reading assessments .... He participates in the regular
> classroom curriculum.

Id. At the May 20, 2009, hearing, R.H.'s mother conceded that
he was performing on grade level:

> Q    Mrs. Hazen, in terms of [R.H.]'s academic ability
>      in school, you've been told that he's on grade
>      level, correct?
>
> A    He's also a year behind the other kids. He's a
>      year older than the other kids, so he should be
>      doing better, but, yes, he's on grade level.
>
> Q    He's in the second grade?
>
> A    Right.

Q     And he's performing second-grade work, correct?

A     Right.

Q     So he's on grade level?

A     As far as I know.

Q     And you have no reason to doubt the fact that he's
      doing second-grade work, correct?

A     No.

Tr. Vol. V at 77-78.  The 2009 IEP also contains the requisite
short- and long-term goals and benchmarks for measuring
achievement.  2009 IEP at 5-10.  Further, it states that, in
addition to occupational therapy and speech and language
pathology services, id. at 12, "Special Education Teacher and/or
Teacher Assistant support in class during Math, Reading, and
Written Language, will be available to provide redirection for
[R.H.] as he works toward independence," id. at 13.  The 2009 IEP
additionally provides that the teacher assistant would be faded
out as data demonstrated the Student's increased independence.
Id.

    Regarding the elimination of R.H.'s one-on-one aide, R.H.'s
mother testified that R.H. was "not ready.  He's not at that
point where he's ready to have an aide taken away from him.
There was no data to support it ...."  Tr. Vol. I at 19; see also
id. at 73-74.  Ms. Alves' testimony differed.  She stated that
she made the decision to recommend a reduction in R.H.'s support
services to 1.5 hours based on observations, assessments of his

academic abilities in the classroom, and discussions with his classroom teacher. Id. at 84, 90, 99-100.

> Q    Now, at what point did you realize that [R.H.] did not need a one-on-one aide all the time?
>
> A    It was probably towards the end of his first grade year, so that would be the 2007/2008 school year.
>
> Q    How did you come to this realization?
>
> A    Well, I guess, at the end of last year he had started to make those gains to become more independent, and then it followed through until the beginning of this school year, the 2008 school year. I made the decision looking at the fact that he hadn't attended summer school last summer, and he didn't regress at all as far as his academics were concerned; that the teacher assistant had begun the fading process and had backed off a little bit in the classroom. She had been always available in the classroom if he had needed it, but she wasn't right with him, and he was still making progress socially, and he was making progress academically.

Tr. Vol. II at 10-11. As for R.H.'s social progress, Ms. Alves stated that "[h]e was developing social skills that were age appropriate. He was conversing with friends." Id. at 10. Ms. Coppola also testified that R.H.'s social skills had greatly improved and that he did not have problems socializing with other children. Tr. Vol. IV at 20-21. Asked what measure of academic progress was used, Ms. Alves responded that "[a]t the beginning of every year we do some baseline assessments to see where they come in as far as their reading, math, and writing skills." Tr. Vol. I at 99. She stated that based on her observations she did

not "see the need to collect data,"[16] Tr. Vol. II at 10, but that data was collected on R.H. after the October 28, 2008, IEP meeting because "the [P]arents had requested it, and I thought that it would be useful to have that sort of information to move forward," Tr. Vol. I at 105.  The 2009 IEP reflects that such data would be taken.  <u>See</u> 2009 IEP at 13.

Ms. Alves was questioned about R.H.'s readiness:

Q    At the time of that January 2009 IEP meeting, had you observed [R.H.] possessing the skill of asking for help if he needed it?

A    Yes.

....

Q    Has [R.H.] mastered the skill of how to raise his hand when he needs help from his classroom teacher?

A    Has he mastered it?  No.  Is he getting better? Yes.

....

Q    If [R.H.] hadn't mastered raising his hand when he needs assistance from his classroom teacher, how is he to perform academic tasks without an aide?

A    Well, our intention wasn't to remove an aide altogether.  He would still have a teacher assistant available for him during the academic

_____

[16] Ms. Eagan was asked at the May 15, 2009, hearing, if observation was a "qualitative research tool[:]"

A    Yes, it was.

Q    Is it considered a valid form of data collection?

A    Yes, it is.

Tr. Vol. IV at 53; <u>see also</u> DSUF ¶ 17 (citing Tr. Vol. II at 10).

40

tasks, and hopefully he would learn the skills and
master the skills to continue to fade that
dependency on that teacher assistant.

Tr. Vol. I at 107-10; see also Tr. Vol. II at 40. She further

testified that R.H.'s ability to accept criticism had improved:

Q    When you've observed [R.H.], do you have any
     opinion on how he accepts criticism or feedback?

A    Well, I can compare him to how he was last year.
     Last year when he would be asked to correct
     something, or if he was told that something was
     done wrong, he had a hard time accepting that sort
     of criticism. This year he has gotten much better.
     He might make a sound of disgust or ahhh or moan or
     something, but it's not nearly as intense as it was
     last year when he might cry or shut down a little,
     but when he has to correct something, he complies.

Tr. Vol. II at 37.

Ms. Alves was also questioned regarding the data the

Department had collected:

Q    Now, based on the data that you collected, are you
     still of the opinion that [R.H.] does not need a
     one-on-one aide all day?

A    Yes, I do agree that [R.H.] does not need a one-on-
     one all day. I do think that he will need some
     support to help with the prompting and to help
     learn some of the learner-quality skills -- learner
     skills to be a successful student in the classroom,
     but he needs to be taught these skills in order to
     be independent. And I think that having a teacher
     assistant during those academic times would
     definitely be useful for [R.H.], but to have a one-
     on-one with him all day during lunch and recess and
     the itinerants and with other service providers
     such as the speech and language pathologist and the
     occupational therapist, he certainly does not need
     anybody with him during those times.

Q    When does he need somebody with him?

A    I would definitely say during his reading
     activities, math, and his written language most
     definitely.  Occasionally in science he'll need
     some support for some of the data interpretation.
     As that gets a little bit harder, I can foresee him
     having some difficulty with that, but most
     definitely for reading and math and written
     language.

....

Q    And how many hours a day have you written that
     [R.H.] would need this teacher assistant?

A    Two and a half hours per day.

Q    And do you stand by that recommendation?

A    I do.  Math is approximately an hour a day, reading
     is approximately an hour a day, and written
     language is approximately a half hour a day, so I
     think that would be a sufficient amount of time for
     [R.H.].

Q    So you made that recommendation in October of 2008,
     correct?

A    Yes.

Q    Since then you've collected data?

A    Correct.

Q    And you are of the opinion today that your data
     supports the recommendation that you made in
     October of 2008; is that correct?

A    That is correct, yes.

....

Q    And just one last question, Ms. Alves.  You are
     absolutely convinced that during his specials,
     during his lunch, during his recess, he does not
     need one-on-one assistance?

A    No, he definitely does not need a one-on-one during
     those times.

Tr. Vol. II at 20-22.  Ms. Combs similarly testified that R.H.
did not need an aide during recess, lunch, physical education, or
art and that he no longer needed a one-on-one aide:

> Q    Again, it's your opinion that at the present time
>      [R.H.] has progressed to the point that he does not
>      need a one-on-one aide; is that correct?
>
> A    That is correct.

Tr. Vol. III at 57-58.

Significantly, no one from the Department or the Groden
Center testified that R.H. needed a one-on-one aide all day.  Ms.
Alves' testimony reflects her opinion that having a one-on-one
aide all day would be detrimental to R.H.:

> Q    Can [R.H.] be independent if he has a one-on-one
>      aide all day?
>
> A    I don't believe so.  I think having somebody with
>      [R.H.] all day is really going to hinder his
>      ability to develop his independence skills.  He's
>      stated to me on a number of occasions that he
>      doesn't raise his hand because the teacher
>      assistant will help him, so he doesn't have to do
>      it.  I think he's becoming very dependent on having
>      somebody with him all day, and it's nice to see,
>      when the teacher assistant is backing off from him,
>      it's nice to see him rise to the occasion and
>      actually raise his hand and use some of his
>      independence skills when he knows that there's
>      nobody there that is going to be helping him.
>
> Q    As part of becoming independent, should [R.H.] be
>      taking direction from the classroom teacher?
>
> A    Absolutely.
>
> Q    Have you observed him now taking direction from the
>      classroom teacher?
>
> A    Absolutely.

....

Q    [S]o your opinion is that [R.H.] is now dependent
     on his aide; is that correct?

A    I think that he had become dependent on his aide.
     I think he's starting to learn some of the
     independence skills so that he has become less
     dependent, and I think with further instruction he
     will continue to become less and less dependent on
     somebody.

Q    Would you agree that there is a process to him
     being less dependent on his aide?  One of those
     steps you had testified to was the teacher
     assistant taking a step back?

A    Yes.

Q    And so is there or has there been any plan made or
     any data on how often the aide is keeping her
     distance versus being right next to him?

A    No, we don't have any data collected on that.  We
     are in the process of developing a plan where we're
     looking at some of the strategies that are working
     with [R.H.] right now in teaching him some of the
     independence skills, and we're going to just
     continue to work on those with him and see what
     works with him and for him.

....

Q    The plan that you referred to, that's not included
     in the 2009 IEP?

A    I think some of the goals that we will be
     addressing are addressed in the IEP.  As far as a
     formalized document, there's nothing attached to
     the IEP.

Tr. Vol. II at 44-49.

     Ms. Combs testified that she had observed R.H. over a dozen
times from January to May of 2009.  <u>See</u> Tr. Vol. III at 13.  She
was asked about her observations:

Q    Now, is it possible for you by observing [R.H.] to
     be able to determine whether or not he needs a one-
     on-one aide?

A    I believe so, yes.

Q    And, therefore, based on your observation, do you
     believe that [R.H.] needs a one-on-one aide?

A    I do not believe he needs to have a one-on-one
     aide.

Q    Why?

A    I do not see -- in the 12 to 16 hours, possibly
     more, that I've spent at West Kingston, I haven't
     seen any indication that he's lagging behind
     academically.  I haven't seen any indication that
     he has significant aberrant behavior that's
     interfering with his learning.  You know, socially,
     if anything, he seems to be more socially isolated
     because of the one-on-one because it's obvious that
     the one-on-one is there for him.  She's with him
     all the time.  So if anything, I think it could
     work to his detriment in the long term, especially
     as he becomes older and moves into the middle
     school, because children at that age simply are not
     going to say and do the things that they normally
     might do if there's an adult standing around with
     [R.H.].    So  I  think  that  right  now  in  my
     observations, I have not seen any indication that
     he would need to have a one-on-one.  I believe the
     classroom teacher is and does fill that role.
     That's good teaching, that's what we do.

Q    So is it your opinion that if his one-on-one aide
     continues, it could be detrimental to [R.H.]?

A    I believe it could be, yes, especially as he moves
     into adolescence.

Tr. Vol. III at 15-16.  Ms. Eagan's testimony was similar:

A    The ultimate goal is for [R.H.] to be independent
     in life.   When we have adults with students,
     especially students on the spectrum, and as they
     get older, it becomes more detrimental.  Nobody
     wants to be with the kid where the adult is

45

> overhearing the conversation at all times.  You
> really want to wean away and you want [R.H.] to be
> able to take direction from multiple people at all
> times.  That is an important skill that he needs.

> Q    In what ways is it detrimental?

> A    Because you become more socially isolated.

> Q    So is it important that that aide be faded out now
> in [R.H.]'s development?

> A    Yes.

Tr. Vol. IV. at 59.  Even Ms. LeVasseur of the Groden Center

agreed that "[n]obody wants to see a child with a one-to-one aide

on top of them [sic] all day long ...."  Tr. Vol. II at 96.

Ms. Combs' testimony on this subject subsequently continued:

> Q    In your opinion, is it possible for an aide to set
> up positive social experiences?

> A    Yes.

> Q    Since he has social needs, I believe that you
> testified, would an aide be helpful in setting up
> positive social experiences for [R.H.]?

> A    Any adult would be helpful, or child.

> ....

> Q    At the times that you witnessed him sitting alone,
> was his aide with him at that time sitting next to
> him?

> A    She was near him, yes.

> Q    And did the aide start any conversation to include
> [R.H.] with the other children?

> A    No.  I directed her to not sit next to him because
> I believe it to be socially stigmatizing because
> kids don't want to go sit next to him because he's
> got somebody standing next to him.

46

Q    Do you believe that [R.H.] has the skills to engage
     with other children if the aide were not present?

A    I would have to take a closer look at that. I
     believe he has a decent set of skills to, yes,
     engage, and I've observed him at recess and while
     playing several of the games in P.E. Kids are
     interested in being near him and around him and
     socializing with him.

Tr. Vol. III at 51-54;[17] <u>see also</u> Parents' Hearing Ex. 11

---

   [17] Dr. Harris disagreed regarding the presence of a one-on-one
aide in social situations and R.H.'s social skills:

   Q    Changing gears to the social areas that you described as
        below age appropriate. Would [R.H.]'s one-on-one aide
        impact his social needs in a detrimental way?

   A    It depends on what she's doing.

   Q    Can a one-to-one aide have a positive effect in working
        with -- in developing [R.H.]'s social needs and making
        them strengths?

   A    Yes. If the aide is aware of how to facilitate and
        support social interactions, she can help by structuring
        interactions, by modeling appropriate questions, by
        bringing [R.H.] into a conversation, a general
        conversation that a group of kids are having, say,
        around a lunch table. If he might not initiate or
        volunteer a response, she could model and then cue a
        response from him.

   ....

   Q    Do you have an opinion about removing support from
        [R.H.] during social times such as lunch and snack and
        recess?

   A    That's actually where I would be most concerned about
        removing all support. ...

   Q    In your opinion, does [R.H.] have the social skills
        right now to be able to succeed in lunch, recess, snack
        without an aide?

   A    No.

Tr Vol. V at 42-44.

47

(Quarterly Progress Report dated 6/17/08).

On cross-examination, Ms. Combs testified as follows:

Q    And isn't it true that you also testified that
     being prompt dependent is really a negative thing
     for [R.H.]?

A    Yes, it is.

Q    And it is your opinion that he has become prompt
     dependent because he has had a one-on-one aide?

A    Yes ....

Tr. Vol. III at 57.[18]  Asked if the proposed 2009 IEP provided

sufficient support for [R.H.], Ms. Combs replied:

A    You know, I don't necessarily agree with the
     statement that he needs to have a teaching
     assistant in class during math, reading, and
     written language.  My observations didn't indicate
     that. ...

Tr. Vol. III at 18.  She stated that "[t]he level of support he

needed, the teacher can deliver and was delivering and should

deliver," id. at 43, and that R.H. should receive support and

prompting from more than one person, id. at 19.  In addition, Ms.

Combs responded affirmatively when asked if she would immediately

begin to fade out even during R.H.'s academic time.  Id.

Ms. Combs noted that R.H. still needed support and that the

Department could not "just go and pluck the aide out and

eliminate it completely."  Id. at 39.  She stated that "we would

---

[18] Ms. Coppola testified that she thought R.H. "became prompt
dependent the second year [she] started working with him."  Tr. Vol.
IV at 25.

observe, which we have, myself and Lisa Alves, his school day, and determine where does he need the support and where doesn't he need the support." Id. at 42. Ms. Coppola testified that "[b]ecause [R.H.] has made such great progress," Tr. Vol. IV at 43, she felt that he would no longer need a one-on-one aide, id. She agreed that R.H. still needed support, but opined that the proposed 2009 IEP provided sufficient support to meet his needs, id., as did Ms. Eagan, Tr. Vol. IV at 58.

Although Plaintiffs' experts, Ms. LeVasseur and Dr. Harris of the Groden Center, expressed concerns about the data collected by the Department and the methodology used to fade out R.H.'s aide, see Tr. Vol. II at 91-92, 94-102; Tr. Vol. V at 18-24, 27-30, their testimony is not entirely at odds with that of Department staff. For example, Ms. LeVasseur testified that in order for R.H. to be independent, his teacher assistant needed to be faded. Tr. Vol. II at 111. Asked if R.H. would need his one-on-one aide while he developed skills to be independent, Ms. LeVasseur responded that there needed to be "strategic support." Id. at 96. She suggested that a teacher or teacher aide "might develop a checklist for him to get through a task that might be difficult for him." Id. at 96-97. She agreed that R.H. could get support and prompting from the classroom teacher or special education teacher; that a teacher, special education teacher, or classroom aide could facilitate his interaction with peers; and

that if he needed to access help, a teacher or classroom aide could prompt him to do so. Tr. Vol. II at 111-14. Ms. LeVasseur responded affirmatively when asked if R.H. needed to be able to accept prompts from more than one person in order to become independent. Id. at 121.

Dr. Harris stated that the prompt data collected by the Department neither contradicted nor supported continuing R.H.'s one-on-one aide. Tr. Vol. V at 27. She "guess[ed] ... he is requiring a fair amount of prompting." Id. at 29. Dr. Harris opined that decisions to reduce aides, including R.H.'s, "should be data-based and should involve a fairly comprehensive baseline data collection period for everything in the child's day to identify a number of different parameters." Id. at 31. She further stated that she would "want to identify his strengths and deficits in terms of why he needs the prompts in some areas." Id. at 32. Asked if it was appropriate to start fading prior to having that data, Dr. Harris responded "I wouldn't do it." Tr. Vol. V at 45. She continued:

> A    [M]y opinion is that there ought to be a written
>      plan for fading and an adequate database and
>      ongoing data collection about performance in all
>      areas, and there's huge chunks of his day on which
>      there is no data.
>
> Q    And until that is accomplished, should the IEP
>      remain as it is in terms of the aide, in your
>      opinion?
>
> ....

> A  I think it's probably appropriate to begin
> attempting to fade with the appropriate, you know,
> safeguards and structure in place.  I can't say
> because I'm not in the classroom.
>
> ....
>
> Q  In your opinion should those services be sustained
> until data collection shows otherwise?
>
> A  Well, it would certainly be the safest and most
> conservative approach to do it that way.  You know,
> I doubt that he needs at this point a full time
> aide in all areas, but I think what hasn't been
> established is where he needs it or what the fading
> plan would be.

Tr. Vol. V at 45-46.

Ms. Eagan addressed the issue of a "fading plan:"

> A  There are many different ways to have plans.  It
> does not necessarily have to be a written plan, as
> long as there is an organized thought process on
> how to fade.
>
> Q  So it is appropriate to have an organized thought
> process about how to fade?
>
> A  Yes.
>
> Q  And do you know if ... an organized thought process
> was developed for the fading of [R.H.]'s aide under
> his last agreed-upon IEP?
>
> A  Yes.
>
> Q  How do you know that?
>
> A  Just by the whole process that they followed,
> originally the teacher assistant in the first year
> was with him and then she started to back off.  She
> was assisting other students in the classrooms, and
> she started going out of the classroom with other
> students.  That is an organized process.

Tr. Vol. IV at 66-67.

It is clear from the foregoing that the Department's experts and Plaintiffs' experts differed as to what data should be taken, how it should be collected, when to begin fading the aide, and how properly to fade the aide.  Cf. Scituate Sch. Comm., 620 F.Supp. at 1236 ("Failure to recommend five reading periods a week is indicative of a difference of opinion on how to treat [the student], not of a fundamental misunderstanding of [his] problems by the school committee.").  However, courts have repeatedly stated that such matters should be entrusted to the expertise of the local educational authorities.  See Schaffer, 546 U.S. at 59 ("IDEA relies heavily upon the expertise of school districts to meet its goals."); Rowley, 458 U.S. at 208 ("We previously have cautioned that courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.")(internal quotation marks omitted); A.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist., 553 F.3d 165, 173 (2nd Cir. 2009)("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."); C.G., 513 F.3d at 289 ("courts should recognize the expertise of educators with respect to the efficacy of educational programs")(citing Rowley, 458 U.S. at 207-08); Deal, 392 F.3d at 854 ("[F]ederal courts are generalists with no expertise in the educational needs of

handicapped children and will benefit from the factfinding of a
state agency, which is presumed to have expertise in the
field."); Roland M., 910 F.2d at 992 (noting that "the alchemy of
reasonable calculation necessarily involves choices among
educational policies and theories–choices which courts,
relatively speaking, are poorly equipped to make.  Academic
standards are matters peculiarly within the expertise of the
[state] department [of education] and of local educational
authorities ....")(alterations in original)(internal quotation
marks omitted).  "While the district court always is required to
give due deference to administrative findings in an IDEA case,
even greater weight is due to an ALJ's determinations on matters
for which educational expertise is relevant," Deal, 392 F.3d at
865, because the ALJ or hearing officer "is a representative of
the state presumed to have both the educational expertise and the
ability to resolve questions of educational methodology that the
federal courts do not have," id.; see also Slater, 2007 WL
2067719, at *2 ("[W]hen the issue implicates a school district's
educational expertise, the courts must give 'due weight' to the
administrative findings because '[j]urists are not trained,
practicing educators.'")(quoting Roland M., 910 F.2d at
989)(second alteration in original).

Moreover, in determining the amount of deference to be
accorded to the administrative proceedings, "the thoroughness of

the hearing officer's findings should be considered, with the degree of deference increased where said findings are thorough and careful." E.W. v. Rocklin Unified Sch. Dist., No. 2:05-cv-0194-MCE-DAD, 2006 WL 2830172, at *5 (E.D. Cal. Sept. 29, 2006) (internal quotation marks omitted). "Substantial weight should be given to the hearing officer's decision when it evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented." Id. (internal quotation marks omitted); see also id. at *6 ("[D]ue weight must be given must be given to the hearing officer's decision commensurate with the level of careful consideration demonstrated by the decision itself."). Such is the case here. See id. at *6 ("The Hearing Officer explained the basis of his opinions, the inferences he drew from the testimony and from the documentary record, and his rationale for affording greater weight to certain evidence and/or testimony. On the basis of all those factors, the Hearing Officer's decision is clearly entitled to substantial deference ...."). Based on the foregoing, the Court concludes that the Hearing Officer's finding that the 2009 IEP provided R.H. with FAPE is entitled to deference.

**VI.  Summary**

The Court finds that a preponderance of the evidence supports the Hearing Officer's findings that, although the

October 27, 2008, meeting was a procedural violation of the IDEA because the Parents were not invited, the violation did not warrant relief because their ability to participate in subsequent IEP meetings was not substantially impaired and was meaningful and R.H. was not denied FAPE; that the decision to eliminate R.H.'s one-on-one aide and reduce his support services was not predetermined prior to the October 28, 2008, and January 7, 2009, IEP meetings; that the Department did not violate the 11/28/07 IEP, thereby denying FAPE, by utilizing R.H.'s aide to assist other students because it was done as part of the fading process, pursuant to the last agreed-upon IEP; and that the proposed 2009 IEP constituted FAPE.  <u>Cf.</u> <u>Lenn</u>, 998 F.2d at 1089 ("[T]he judge applied the proper burden of proof, concluding that the Lenns had not proven [their case] by a preponderance of the evidence.") (alteration in original)(internal quotation marks omitted).

## VII.  Conclusion

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiffs' Motion for Summary Judgment be DENIED.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the

district court's decision.  See <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ David L. Martin</u>
DAVID L. MARTIN
United States Magistrate Judge
November 22, 2010